UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


THIRTEENTH FLOOR ENTERTAINMENT CENTER, LLC                APPELLANT


v.                                            CIVIL ACTION NO. 3:11CV-269-S
                                              BANKR. CASE NO. 04-36349


LOUISVILLE GALLERIA, LLC                                   APPELLEE


### MEMORANDUM OPINION

This matter is before the court on appeal from a decision of the United States Bankruptcy Court finding in favor of the defendant, Louisville Galleria, LLC ("LG") on a counterclaim for breach of contract against the debtor, Thirteenth Floor Entertainment Center, LLC, formerly known as Premier Health and Fitness Clubs, LLC ("Premier").[1]

LG operates Fourth Street Live in downtown Louisville, a business development consisting of a group of buildings, including the historic Kaufman-Strauss Building.[2] Sometime in 2002, Premier entered into discussions with LG concerning Premier's desire to lease space in the Fourth Street Live complex to open a fitness center.

---

[1] The action was commenced in the Jefferson County, Kentucky, Circuit Court by Premier against LG on a claim for breach of contract. LG removed the action upon the filing of Premier's bankruptcy petition. LG then filed a counterclaim for breach of contract.

[2] The underlying facts recited herein are taken from the Findings of Fact issued by the United States Bankruptcy Court. These facts are not disputed on appeal.

For approximately one year. the parties negotiated the terms of a lease for space on the second floor in the Kaufman-Strauss Building.  The parties were represented by experienced counsel, and at least 5 formal drafts of the lease document were exchanged prior to the execution of the so called "Shopping Center Lease."  (hereinafter, "the Lease").  It was ascertained that there were some 400+ changes made and accepted between the first and final drafts of the document, thus evidencing that much deliberation went into the crafting of the final product.  Exhibits were also exchanged and were incorporated by reference into the Lease.  While Premier was represented by counsel, it is undisputed that Premier did not have an architect or engineer review any draft of the Lease.  Premier urges that in early November, both Premier and LG had concerns about the suitability of the then-existing chilled water air conditioning system for a fitness center in the second-floor location in the Kaufman-Strauss Building.  In any event, the plaintiff signed the Lease on November 19, 2003 and LG signed on November 24, 2003, then attaching the referenced exhibits.

The Bankruptcy Court found that the Lease was a fully integrated document, noting the sophistication of the parties, the assistance of able counsel in negotiating its terms, and the inclusion of an integration clause stating:

> There are no oral agreements between the parties hereto affecting this Lease and/or the Premises, and this Lease supersedes and cancels any and all previous written or oral negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease...Tenant hereby expressly acknowledges that the Landlord Parties have made no representations, warranties, inducements, or promises with respect to the Shopping Center or the Premises or this Lease...except as herein expressly set forth.  Tenant acknowledges that prior to entering into this Lease, Tenant has satisfied itself of all its concerns, if any, by conducting an independent investigation into all prior information provided by (or statements made by) Landlord or its agents...

Lease, § 3401.

As noted by the Bankruptcy Court, an integration clause in a contract is "a sufficient basis to consider the agreement the complete and accurate integration of the contract." *KFC Corp. v. Darsam Corp.*, 543 F.Supp. 222, 225 (W.D.Ky. 1982); *Papa John's Int'l, Inc. v. Dynamic Pizza, Inc.*, 317 F.Supp.2d 740, 745 (W.D.Ky. 2004). We find no error in the Bankruptcy Court's conclusion that

> As discussed above, Plaintiff and Defendant were intelligent parties, each assisted by counsel, who freely signed a comprehensive, written document. Plaintiff cannot now argue that the lease meant something else or that the parties meant to agree to different terms and conditions. The fact that Plaintiff might have intended different results is insufficient to construe a contract at variance with its plain and unambiguous terms. [ citing *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 385 (Ky.App. 2002)].

Mem.Op., p. 12. Thus we find Premier's eighth issue on appeal – that the Bankruptcy Court erred in refusing to hear evidence as to the non-integration of the contract – to be without merit.

Premier's other seven claims of error all revolve around its contention that LG's work was not substantially complete when it delivered the Premises to Premier on January 30, 2004.

The Lease provided that upon delivery of possession of the Premises with notice of the substantial completion of LG's work, as listed in Exhibit C to the lease, Premier would become responsible for the utilities, was required to maintain certain insurance coverage, and the 180-day "Fixturing Period" would begin. Lease, § 316. The "Fixturing Period" was the time in which Premier was to prepare the premises for opening of the business. Lease, § 201(m).

With regard to Possession, the Lease provided that

> 401. [LG] shall substantially complete [LG]'s Work set forth in Exhibit C ("[LG]'s Work") on or before January 1, 2004. Except for completion of such [LG] Work, [Premier] accepts the Premises in "as is" condition. [Premier] expressly

> acknowledges that [LG] makes no representations or warranties regarding the suitability of the Premises for [Premier]'s business.
>
> Within thirty (30 days after Notice of Possession, [LG] and [Premier] shall jointly prepare and agree upon a punchlist ("the Punchlist") of incomplete elements of [LG]'s Work, if any, and [LG] shall cause the incomplete work set forth on said Punchlist to be performed with due diligence. [LG] shall complete punchlist items so as not to interfere with [Premier]'s work. Tenant's taking possession of the Premises shall be conclusive evidence against [Premier] that the Premises were in satisfactory condition when [Premier] took possession, subject only to completion of such Punchlist items and latent defects of which [LG] is notified in writing within ninety (90) days...
>
> 402. Upon the date of Notice of Possession from [LG], [Premier] shall with due diligence proceed to install such fixtures and equipment and to perform all other work as shall be required pursuant to [Premier]'s Plans (as defined in Section 1401 hereof), as approved in writing by [LG], or otherwise necessary or appropriate in order to prepare the Premises for opening and continued operation of [Premier]'s business ("[Premier]'s Work").

Exhibit C listed seventeen items of LG's Work, sixteen of which there is no dispute were substantially completed prior to delivery of the Premises. Premier contends that LG did not substantially complete item 10:

> [LG] will supply chilled water to the Premises via a central plant or, at [LG]'s discretion, [LG] shall provide HVAC rooftop units with adequate tonnage capacity for [Premier]'s use as determined by certified mechanical engineers. [Premier] will be responsible for all distribution and for modifying the air distribution equipment in the space as required to meet its needs.

Ex. C, ¶ 10.

The crux of Premier's argument is that LG's decision to demolish the existing chilled water system and put in a rooftop HVAC system prevented LG's substantial completion of Item 10 until after Premier was required to meet various obligations under the Lease. Premier thus contends that the Notice of Possession did not become effective until the installation of the HVAC system was substantially complete, and therefore its failure to meet various performance deadlines, including,

- 4 -

ultimately, failing to ever open the fitness center or to pay rent were not breaches of the Lease. Premier urges that to find otherwise, as the Bankruptcy court did, is to reach a nonsensical conclusion which yields an absurd result. Premier postulates that the chilled water system was not "feasible," for the operation of its fitness center, and therefore the completion of the rooftop units was essential to LG's substantial completion of its Work under the Lease.

A statement by LG's engineers is referenced by Premier in support of its argument. It states, in part:

> ...If the second floor is a gymnasium, we do not recommend that the existing air handler be shared between a gym and the unknown tenant on the first floor. The gym odors and humidity mixing with the air supplied to a restaurant, retail, or entertainment space on the first floor below would be undesirable.

11/19/03 Kerr-Greulich e-mail. Premier contends that knowledge of a potential "odor problem" with use of a chilled water system to cool a fitness center at that location must preclude the court's finding that LG's delivery of the space with chilled water constituted delivery with LG's Work substantially complete. In other words, Premier contends that the court should not ignore the fact that LG knew that there was more for it to do with respect to the cooling systems in order to "do the right thing." Reply, p. 2, quoting Blake Cordish, Tr. 3-42. Premier concludes that the court reaches an absurd result by concluding that Exhibit C, Item 10 was substantially completed by delivery of the Premises equipped with chilled water for an air conditioning system which would ultimately prove problematic with a future first floor tenant of the Kaufman-Strauss Building.

We conclude, however, that a finding of substantial completion of Exhibit C, Item 10 on the delivery date is not inconsistent with the later installation of an HVAC system which was completed in September of 2004. The clear language of Item 10 provides that LG will supply Premier with chilled water via a central plant, or, at LG's option, adequate HVAC rooftop units. It is undisputed

that chilled water via a central plant was provided, despite the fact that the existing cooling system was demolished in July, 2004 and replaced with HVAC rooftop units. Premier does not deny that the chilled water system was in place on January 30, 2004. Thus Item 10 was substantially completed despite a later decision to replace the system with rooftop units. We affirm the Bankruptcy Court's conclusion that Notice of Possession was effective on the date of delivery of the Premises.

The Bankruptcy Court found further support for its conclusion in the fact that Premier never raised any question about the cooling system until after the Lease was terminated for its failure to perform:

> [LG] delivered the Premises to [Premier] on January 30, 2004, providing Plaintiff with a Notice of Possession as required under Section 316 of the lease. [Premier] asserts that [LG] failed to provide either chilled water to the Premises or HVAC rooftop units as required under Paragraph 10 of Exhibit C of the Lease prior to sending the Notice of Possession. [footnote omitted]. Premier, however, never sent notice to [LG] under Section 2705 of the Lease[3] disputing the Notice of Possession or otherwise asserting that delivery of the Premises did not occur on January 30, 2004. [Premier] also never formally contacted [LG] under Section 2705 of the Lease regarding a punchlist of incomplete items of Exhibit C.[4] Moreover, [Premier] delivered an estoppel certificate to [LG]'s lender warranting that [Premier] had accepted possession and was occupying the Premises and that [LG] had complied with all its Lease obligations with respect to the construction, fixturing and equipping of the Premises. [Premier] also acknowledged in a March 3, 2004 email to [LG] that the space was ready for build-out...[Premier] never sent [LG] formal notice expressing its belief that [LG] had breached the Lease by changing systems and delaying [Premier]'s work or even expressing concern with the change and requesting a written extension of deadlines.

Mem.Op., pp. 6-7.

---

[3] Section 2705 requires that notices, demands, and requests of either party to the Lease be made in writing.

[4] Premier urges that the replacement of an air conditioning system cannot be a "punchlist" item, as punchlists usually involving minor detail work after possession of premises is transferred to a tenant. However, Section 401 requires the parties to prepare a punchlist "*of incomplete elements of [LG]'s Work, if any.*" LG's "Work" is defined as the listed items on Exhibit C. Premier's argument that Item 10 is not a punchlist item is without merit.

The Bankruptcy Court found that LG gave Premier proper notice in accordance with Section 2705 of the Lease of Premier's failure to meet the performance deadlines in the Lease. In particular, Section 1401 required Premier to deliver for LG's approval within ninety days of the execution of the Lease copies of "plans and specifications showing in reasonable detail any and all interior and/or exterior alterations or improvements that [Premier] proposes to make to the Premises, including interior and exterior signage," such plans required to be "in accordance with all requirements of all applicable governmental authorities and Laws for submissions to obtain a building permit." *Id*. Premier's plans were due February 24, 2004. It submitted only a tentative "layout" plan. It is undisputed that this "layout" plan could not have been utilized to obtain a building permit. Mem.Op. p.7. LG delivered notices of default to Premier regarding the failure to deliver plans on March 3, 2004 and April 15, 2004. LG did not seek to terminate the Lease at that time, but rather accepted Premier's completed plans on July 8, 2004. Premier's plans were approved on July 13, 2004. Mem.Op., p. 8. While Premier now urges that it was prevented from completing its plans by LG's decision to change the air conditioning system, it did not provide notice seeking extra time to comply due to LG's actions.

Under Section 402, Premier was required to proceed with due diligence to install fixtures and equipment and to perform all other work required by its plans in order to prepare for the opening and operation of the fitness center. Sections 201(m) and 307 required that the work be performed within a 180-day "Fixturing Period" which commenced on the date of the Notice of Possession. As the Notice of Possession was sent on January 30, 2004, the Fixturing Period ended on July 28, 2004, fifteen days after the approval of its plans. Needless to say, Premier did not complete the renovations. Mem.Op., p. 8.

Sections 321 and 701 required Premier to begin paying rent on the Rent Commencement Date, defined as the next calendar day after the last day of the Fixturing Period, or the date on which Premier opened its fitness center for business, whichever came first.  The Rent Commencement Date was July 29, 2004, as Premier never opened the fitness center.  Premier never paid LG rent under the Lease.  LG delivered a notice of default to premier on August 2, 2004 for failure to pay rent and failure ot operate its business.  It sent another such notice on August 31, 2004.  On September 8, 2004, LG delivered a general notice of default which included an express statement reserving its enforcement rights under the lease.  On October 6, 2004, LG sent Premier notice of termination of the Lease.  Mem.Op. pp. 25-26.

Again, Premier urges that the Notice of Possession was not effective until after installation of the HVAC system, thus the Fixturing Period did not begin to run with the delivery of the Notice.  As we have found that the Notice was effective, we reject this argument.

Additionally, Premier contends that

> LG's position is bizarre in that it requires things to be done which are impossible.  Four examples of this absurdity are as follows.  First, LG's position requires that Premier must open for business on July 29, 2004 and continuously operate thereafter.  The rooftop units have not even been installed at that point in time, although LG's exterior design and the Premier interior design contemplate rooftop units.  See Joint Exhibit 170.  Opening a gym in late July in Louisville, Kentucky without air conditioning and operating continuously thereafter is absurd, yet that is the only conclusion resulting from LG's position.  Second, it is also completely unfair to require rent be paid by Premier when the installation of the rooftop units is a matter required of and wholly in the control of LG.  Third, the proposition that the fixturing period has expired before the rooftop units are installed makes no sense.  These units are critical to the work that Premier must do inside its Premises.  Fourth, the argument that a punch list [sic] is required before the rooftop units are installed violates the very concept of a punch list [sic].  A punch list is done once substantial completion is achieved, not before.

Reply, p. 6.  Premier's four arguments will be addressed *seriatim*.

First, anyone who has stepped outside in late July in Louisville, Kentucky will find some facial appeal in the argument that it is patently unreasonable to require an un-air conditioned fitness center to open in the middle of a Louisville summer. This argument is based upon the notion that potential patrons would not choose to work out in a sweltering gym. This sweat-grounded logic is, however, wholly speculative and beside the point. The Lease agreement does not provide for Premier's ability to open and run its business profitably. Further, to the extent that Premier was, *arguendo*, inhibited in its ability to successfully operate a fitness center business at all[5] by LG's failure to have an HVAC system up and running by July 29, 2004, Premier never provided notice of the issue to LG. Premier neither sought a reduction in rent nor a delay in opening pending the completion of the HVAC installation. In light of the fact that Premier failed to provide any notice to LG under the Lease in order to protect itself from any contingency beyond its own control, this argument must be rejected.

Second, any perceived unfairness in requiring Premier to pay rent during the period from the Rent Commencement Date to the completion of the installation of the HVAC system, a period spanning a number of weeks, was never raised by Premier. Premier did not seek a reduction in rent nor did it notify LG of any claimed interference by LG which Premier believed entitled it to reduction or mitigation of rent. The court sees no absurdity in the requirement that Premier pay rent for Premises which were without air conditioning for a number of weeks. The option to install an HVAC system was specifically contemplated by the Lease and, in fact, urged vigorously by Premier to be a necessary improvement to the property. We thus reject Premier's argument on this basis.

---

[5] A contention that has been made only hypothetically. Premier has not offered evidence that it did not open its business because it did not believe it could do so profitably. The facts of record establish to the contrary that Premier never completed its build-out of the Premises.

The Third and Fourth arguments can be addressed together. Premier argues that it makes no sense to find that the Fixturing Period expired or that a punchlist was required before completion of the installation of the HVAC system. However, these contentions fail in light of the clear and unambiguous language of the Lease. Both the commencement of the Fixturing Period and the requirement of the punchlist run from the date of the Notice of Possession. The court has already concluded that the Notice of Possession was effective on delivery of the Premises on January 30, 2004. We reiterate that the provision of chilled water satisfied Exhibit C, Item 10 so as to render delivery of the Premises under substantial completion of LG's Work, as defined by the Lease. The performance periods for the punchlist and for fixturing thus began to run on January 30. This court agrees with the Bankruptcy Court's conclusion that if the decision to replace the chilled water system, made in April, 2004, "truly was preventing [Premier]'s performance, Premier should have obtained a formal modification of the Lease, or at least sought a formal adjudication of breach by [LG], well before [LG] terminated the Lease for [Premier]'s failure to perform." Amend.Ord., p. 2. As the lease provisions were operable and no modification of those terms was sought, we find Premier's *post hoc* argument that it is unreasonable to find Premier to have breached the Lease is unavailing.

In sum, the Bankruptcy Court found in its thorough and well reasoned decision[6] that this case "presents a textbook example of how failure to observe contract formalities can render a business relationship extremely complicated, and ultimately unsatisfactory to one or both parties." Mem.Op. p. 2. We agree and affirm the decision of the Bankruptcy Court in its entirety.

---

[6]We read the Memorandum Opinion and Order Denying Plaintiff's Motion to Alter, Amend or Vacate together.

The Bankruptcy Court found that Premier breached the Lease and that LG was entitled to an award of damages in the sum of $1,269,739.80.  Premier has not challenged the damage award on appeal.

A separate order will be entered this date in accordance with this opinion.

March 2, 2012

Charles R. Simpson III, Judge
United States District Court